# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

KAMARA CRAWFORD and
OLIVER CRAWFORD, SR.,

       Plaintiffs,

v.                                  CASE NO: 8:08-cv-927-T-26TBM

CITY OF TAMPA, et al.,

       Defendants.

_____/

## O R D E R

Before the Court is Defendant's Motion for Summary Judgment with attachments, Statement of Undisputed Facts and supporting documents (Dkts. 72, 74 & 75), Plaintiffs' Opposition (Dkt. 84), and Plaintiffs' affidavit and Response to Statement of Undisputed Facts. (Dkt. 85 & 86). After careful consideration of the submissions of the parties, the applicable law, and the entire file, the Court concludes that the motion should be granted.

The parties were unable to agree about any of the facts[1] and therefore the Court will set forth the facts in the light most favorable to the non-moving parties, the Plaintiffs. At this juncture, the claims remaining in the Third Amended Complaint include racial

---

[1] Defendants filed a Statement of Undisputed Facts, but Plaintiffs denied each and every fact set forth in the Statement. (Dkts. 74 & 86).

discrimination and wrongful termination brought under 42 U.S.C. § 1981 and 1983 and a

claim for consortium brought by Plaintiff husband.  (Dkt. 61).[2]

## **Pertinent Facts**

Plaintiff Mrs. Crawford served as the legal secretary for the Tampa Police

Department's Legal Unit from 1995[3] through 1999 when she received an evaluation that

was lower than usual for her----instead of "outstanding," merely "fully meets

expectations."  (Dkt. 74, Ex. 1).  Although Plaintiff was not terminated until May 2007,

the facts begin here in the Plaintiff's mind because she filed a grievance over this

evaluation.  She filed this first grievance after receiving an evaluation which did not give

her an opportunity to improve in designated areas over the 90-day performance review

period.  (Dkt. 74, Ex. 1).  The basis for her lowered marks apparently emanated from

friction that existed between Plaintiff and another employee, Ms. Garcia, and instead of

---

[2]  Order of Jan. 9, 2009, on Defendants' Motion to Dismiss.

[3]  In February 1995, she was hired by a white male, Kirby Rainsberger.  (Dkt. 74, pp. 17-18).  She served as the legal secretary for Ray Lopez, and Linda Ambrase, her supervisor as executive aide to Mr. Rainsberger, evaluated Plaintiff.  (Dkt. 74, p. 20).  Ms. Ambrase continued to evaluate Plaintiff for three years until she retired.  (Dkt. 74, p. 20).  After Ms. Ambrase retired, Mr. Rainsberger evaluated Plaintiff until she was promoted to the internal affairs department as Office Support Specialist 4 in March 2000.  (Dkt. 74, pp. 20-21 & 29).

Her promotions continued.  After she was promoted to the internal affairs department, she was evaluated by Captain Jake Slater.  (Dkt. 74, p. 29).  She was thereafter promoted to the Land Development office as a Planning Research Analyst and was evaluated by Susan Johnson, her supervisor there.  (Dkt. 74, pp. 36-37).  She was then finally promoted to the position of Urban Planner II in the Construction Services Division (CSR) of Growth Management Development Services (GMDS).

an "outstanding," her usual grade, Plaintiff was given a "fully meets expectations" under the section titled interpersonal skills. (Dkt. 74, Ex. 1). The other categories were lowered from "outstanding" to "excellent." (Dkt. 74, Ex. 1). Plaintiff claims she "won" the grievance, which means that she gained back nine of the ten points she missed. (Dkt. 74, pp. 21-22). Plaintiff readily admits that she made no mention of race discrimination in the 1999 grievance. (Dkt. 74, pp. 22-23). At her deposition she testified, however, that race "could have been" an issue or a "possibility" in this evaluation. (Dkt. 74, p. 23).[4]

Plaintiff testified that racial discrimination by the whites she worked for at the City occurred the entire time that she was employed there. (Dkt. 74, p. 27). Nothing ever stopped her, however, from receiving her salary raises twice a year, and she received a raise when she moved to the internal affairs department, the next department to which she moved after the 1999 evaluation. (Dkt. 74, pp. 26, 28 & 34). She eventually received a promotion to the Land Development office. (Dkt. 74, p. 36).

It was while she was working in the Land Development office that she noticed disparate treatment. (Dkt. 74, pp. 37-38). A white woman, Linda (or Angela) Hurley, received an "outstanding" rating during her new employee six-month probationary period, which Plaintiff did not receive as a new probationary employee in the Land Development office. (Dkt. 74, pp. 37-38). She claims that Mr. Snelling, the manager of the Land Development office, told her that a new probationary employee could not

---

[4] She testified that Mr. Rainsberger "made a smirk on his face." (Dkt. 74, p. 25).

receive an "outstanding" grade and he told Ms. Hurley not to convey to Plaintiff that information, nor that she received an outstanding evaluation. Plaintiff testified that she could have received more money sooner had she received an "outstanding" rating during her probationary period in that department. (Dkt. 74, p. 38).

Finally, in 2005, Plaintiff was promoted again to Growth Management Development Services (GMDS) where her supervisor was Mark Brenchley. (Dkt. 74, pp. 39-40). She was hired over a white woman whose application had apparently been lost. (Dkt. 74, p. 41). She was hired as an Urban Planner II in the Construction Services Division (CSR) or GMDS. (Dkt. 74, p. 42). Mr. Brenchley gave Plaintiff all "outstanding" evaluations in that department. (Dkt. 74, p. 44).

Later, during 2005, Plaintiff apparently attempted to get paid for her sick leave when she was off sick. (Dkt. 74, p. 41). When she was shown the letter at her deposition, however, she did not recall ever exhausting her sick leave in 2005. (Dkt. 74, p. 42). She recalled only that at some point in time while she was an Urban Planner II, she applied for sick leave. (Dkt. 74, p. 42). When asked if she did not receive retroactive sick leave because her supervisor was racist, she said, "Of course." (Dkt. 74, p. 43). She could not express, however, what he did to make her feel as though he discriminated against her based on her African-American race. (Dkt. 74, p. 43).

On her last evaluation of October 4m 2006, she admitted writing the following:

> I believe I have found my home here is CSR! There is such
> comradery here, which is a direct reflection of my supervisor,
> Mark Brenchley, and my manager, Nick D'Andrea.

(Dkt. 74, p. 44, Ex. 3).  She testified that she was not lying when she wrote this on her evaluation.  (Dkt. 74, p. 45).

Apart from her job at the City, Plaintiff was the sole proprietor of a business known as Intellect Worldwide or Intellect Professional Services, which she founded in 1997 as a consulting transcription and technical writing company.  (Dkt. 74, pp. 46-48, Ex. 5).  In March 2007, by letter, Plaintiff invited the City to participate in a trade show hosted by her business, which was later the subject of the pre-disciplinary hearing that precipitated her termination. (Dkt. 74, p. 49,  Ex. 5).  In that letter, Plaintiff requested the City to pay for its employees to attend at prices ranging from $150 to $10,000.  (Dkt. 74, pp. 49-50, Ex. 5).  Nevertheless, no one from the City ever participated in her private business' conventions or activities, but the City did not tell her why until she was fired. (Dkt. 74, p. 52).

Plaintiff requested leave or absence without pay "AWP" on March 19, 2007, for March 23, 2007 through April 5, 2007.  (Dkt. 74, pp. 52-53, Ex. 6).  Plaintiff's memorandum requesting leave does not state the purpose for which she desired leave; it merely reflects that she had exhausted all of her annual leave.  (Dkt. 74, Ex. 6).  She testified at deposition that she needed this time off to work on her business and the upcoming convention.  (Dkt. 74, p. 53).  In another letter, also dated March 19, 2007, Plaintiff stated the reason she requested leave without pay:

> I am in the midst of a huge undertaking of an international
> convention that will take place on Friday, April 6 thru

> Saturday, April 7, 2007, at the Marriott Waterside Hotel & Marina in downtown Tampa.
>
> .   .   .   .
>
> A formal letter was sent to Mayor Iorio approximately two (2) weeks ago, requesting that the City; specifically law enforcement and technology employees, be allowed to take advantage of these specific trainings. The letter was then forwarded (by Bridgett McCormick) to Chief Hogue and to Major John Bennett. The last update that I received (last week) was that the training would like be posted and opened to law enforcement personnel.
>
> As this event is not only important to me, but to the agencies that were kind enough to authorize such trainings, I need additional time to complete this project.
>
> As an aside, March 2007, I was honored to become the recipient of the "Cambridge Who's Who Among Executive & Professional Women" for 2007-2008.

(Dkt. 74, Ex. 7). This request was denied because according to the City personnel manual, AWP is granted only on an emergency basis and not in lieu of annual leave. (Dkt. 74, p. 54, Ex. 8).

Plaintiff testified that she took that time period off despite the denial, and she contends she took the leave "with medical substantiation." (Dkt. 74, p. 55). She admitted that she received the meeting she requested in her March 23rd e-mail to discuss her "emergency" request for leave. (Dkt. 74, p. 55, Ex. 8). After the meeting, she claims she was given the time off based on the medical reasons of major depressive disorder, acute anxiety disorder, and post-traumatic stress syndrome. (Dkt. 74, p. 56). She testified that she did not work on her business' convention because the convention was cancelled.

(Dkt. 74, pp. 56-57).  Plaintiff never returned to work from leave, and the City eventually

terminated her.  (Dkt. 74, p. 57).

Plaintiff testified that she did not remember when over the course of the

employment that she applied to withdraw hours from the sick leave bank.[5]  (Dkt. 74, p.

57).  She testified that she knew that applications to the sick leave bank require an

employee to submit a second doctor's opinion and to be out on leave for only a certain

amount of time before applying.[6] (Dkt. 74, p. 57).  She admitted that she had already

taken 600 hours from the sick leave bank in 2005.[7]  (Dkt. 74, p. 57).   She also agreed that

she knew of no other person who was treated better in connection with the sick leave

bank policy based on his or her race.   (Dkt. 74, pp. 58-59).  She also testified that she

figured out later on her own that she actually had 200 more hours of sick leave at the time

of her last leave, but she admitted that she never requested to use it.  (Dkt. 74, pp. 58-59).

---

[5]   The sick leave bank is a voluntary program that "provides participating
employees continued income due to absences resulting from personal catastrophic illness
or accident to the extent that normal leave balances are depleted."  (Dkt. 75, Aff. of Sarah
Lang, para. 4).  An employee may not take more than a maximum of 800 hours during
employment.  (Dkt. 75, Aff. of Lang, Exh. 1—"6.  Withdrawals . . . b. Maximum
Usage—A participant may be authorized to use leave from the sick leave bank for a
maximum of 800 work hours during employment.").

[6]   The City's sick leave bank rule requires that sick leave must be applied for
within seven days of the date the employee starts using the leave.  (Dkt. 74, p. 58).

[7]   This statement is substantiated by the affidavit of Sarah Lang in which Ms.
Lang verifies that Plaintiff first used the sick leave bank in 1998 for a total of 56 hours.
(Dkt. 75, Aff. of Lang, para. 5).  In 2005, she applied for and received 544 more hours
from the sick leave bank.  (Dkt. 75, Aff. of Lang, para. 6).  "As of 2007, she had utilized
600 of 800 hours of her sick leave bank."  (Dkt. 75, Aff. of Lang, para. 6).

She was out on leave for at least 8 weeks. (Dkt. 74, p. 60). Although she received notice of the pre-disciplinary meeting, she did not attend it. (Dkt. 74, p. 60).

With respect to individuals she claims received better treatment with respect to the sick leave bank, she named two white people: Catherine Coyle and Mark Brenchley. (Dkt. 74, p. 61). Catherine Coyle suffered from a knee or leg injury and was out for three months, and Mark Brenchley suffered from prostrate cancer and was out for three or four weeks. (Dkt. 74, p. 61). She testified that Eric Cotton, another Urban Planner II, told her that both of them did not get charged with sick time because they were permitted to work from home, and the City manager took their work and time cards to them at work. (Dkt. 74, pp. 61-62). Eric Cotton, a white male, was complaining about the unfairness of the situation to her. (Dkt. 74, p. 63). Nick D'Andrea told her that Mark Brenchley was going to work from home. (Dkt. 74, p. 63). She admitted that she never requested to work from home. (Dkt. 74, p. 64). She never asked her doctor if she was allowed to work, either. (Dkt. 74, p. 65). One note from her physician, Dr. Dore, dated April 23, 2007, states that she "will be able to return to work by the beginning of May 2007. (Dkt. 74, Ex. 9). A second letter from Dr. Dore dated April 27, 2007, states that Plaintiff had been diagnosed with major depressive disorder and anxiety disorder and "is not able to work at this time." (Dkt. 74, Ex. 10). The letter further provides that she "will likely be able to return to work on May 23, 2007." (Dkt. 74, Ex. 10). Another letter from Dr. Dore dated May 23, 2007, the day before her termination, states that Plaintiff "will need to continue her leave until June 29, 2007." (Dkt. 74, Ex. 15).

Plaintiff's application for usage of sick leave bank dated April 26, 2007, shows that she was requesting an "extended leave" from March 28, 2007, through May 23, 2007. (Dkt. 74, Ex. 11). The application was disapproved on May 11, 2007, based on the untimeliness of her request— it was beyond the seven-day period from the beginning of the leave— and on the absence of medical substantiation, a second physician's note. (Dkt. 74, pp. 67-68, Ex. 11). Plaintiff testified that she did submit a second physician's note dated May 24, 2007; however, she was terminated on that date. (Dkt. 74, pp. 67-68, Ex. 13). The second note from Dr. Thierry stated that she was seen in his office on May 24, 2007 and that "she should not return to work at this time. She may be able to return on 8/2/07." (Dkt. 74, Ex. 13).

Earlier on May 17, 2007, the City issued a Notice of Disciplinary Action for "incompetence." (Dkt. 74, pp. 68, Ex. 12). The dismissal states that it will be effective May 24, 2007, unless she at least appears at the pre-disciplinary hearing scheduled on that day to discuss the Notice of Disciplinary Action. (Dkt. 74, Ex. 12). Plaintiff failed to attend the pre-disciplinary hearing on May 24, 2007, and was terminated that day. (Dkt. 74, Ex. 12). In addition to incompetence, the written reasons given in the Notice of Disciplinary Action are essentially habitual tardiness, absenteeism[8], and/or abuse of leave privileges[9] and are based on the following incidents:

---

[8] AWL falls under this category.

[9] See docket 75, Aff. of Lang at paragraph 11.

(1)     The request for AWL of March 22, 2007, for the period of March 28, 2007, through April 5, 2007, for the purposes of preparing for a convention hosted by her private company was denied because her annual leave balance was depleted.

(2)     On March 28, 2007, Plaintiff called into work late and left a voice mail message that she would not be at work.  Her supervisor returned the call and requested medical substantiation, which was not forthcoming.  Plaintiff received 8.0 hours of AWL because her leave was not approved.

(3)     On April 2, 2007, Plaintiff conducted herself in the same manner, failing to obtain authorization and approval for use of the sick leave bank, and for the same reasons, she received another 8.0 hours for AWL.

(4)     On April 5, 2007, for the same reasons, she received another 8.0 hours for AWL.

(5)     On April 9, 2007, for the same reasons, she received another 8.0 hours for AWL.

(6)     On April 10, 2007, for the same reasons, she received another 8.0 hours for AWL.

(7)     On April 16, 2007, for the same reasons, she received another 8.0 hours for AWL.

(8)     On April 17, 2007, for the same reasons, she received another 8.0 hours for AWL.

(9)      On April 23, 2007, for the same reasons, she received another 8.0 hours for

AWL.

(Dkt. 74, Ex. 12).  In addition to the eight days listed above (64 hours) of AWL, the

written reasons for dismissal include Plaintiff's use of her private business to engage in

business with the City, particularly after she had received approval to conduct her private

business on the condition that it not do business with the City, thereby creating of conflict

of interest.  (Dkt. 74, pp. 68-69, Ex. 12).  It was also pointed out that her use of the City's

computer network to conduct her private business violated the City's personnel policy

regarding computer usage.  (Dkt. 74, Ex. 12).[10]

## Race Discrimination/Disparate Treatment (Counts II and VI)

Plaintiff Mrs. Crawford brings her racial discrimination and disparate treatment

claim pursuant to section 1981, which will be analyzed using the same framework as a

Title VII claim.  Rice-Lamar v. City of Fort Lauderdale, 232 F.3d 836, 843 n. 11 (11th

Cir. 2000).  There is no direct evidence of racial discrimination in this case.  See

Schoenfeld v. Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999) (defining direct evidence in

Title VII case as "if believed, proves [the] existence of [a] fact in issue without inference

or presumption.") (citations omitted).  This record is devoid of any mention of a "blatant

remark" referencing anyone's race, or sex or age for that matter.  Plaintiff's own

deposition testimony reveals that she believes that race "could" have possibly been an

---

[10]    During her deposition, Plaintiff denied the allegations concerning improper
computer usage.  (Dkt. 74, pp. 69-70).

issue after she filed her 1999 grievance.[11]  (Dkt. 74, p. 23).  She has no proof other than

the fact that she is African-American and "could feel" discrimination and could "see it."

(Dkt. 74, p. 23).  Plaintiff could identify nothing specific that led her to believe that she

was being discriminated against on the basis of race or sex or age.  (Dkt. 74, p. 25).  She

relied on the generalities of "how he [Mr. Rainsberger] acted."  (Dkt. 74, p. 25).

Reviewing the circumstantial evidence presented, the Court must adhere to the

burden shifting analysis of McDonnell Douglas.[12]  Four prongs must be shown for

Plaintiff to prevail.  Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir. 2004).

First, Plaintiff must establish that she belongs to a protected class, which in this case is

her African-American race.  Next, she must show that she was subjected to an adverse

employment action, which in this case is limited, by Plaintiff's admission, to her

termination from work.  (Dkt. 74, pp. 28 & 35-36).  Third, she must show that her

employer treated similarly situated employees outside her classification more favorably,

which will be addressed in full below.[13]  Finally, she must show that she was qualified for

the position, which she has done in the sense that she was hired in the first place and

---

[11]  Plaintiff filed a grievance based on her supervisor Mr. Rainsberger's evaluation being lowered from an "outstanding" to an "excellent."  (Dkt. 74, p. 24).

[12]  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

[13]  The third prong requires Plaintiff to identify a comparator who is "similarly situated" in all relevant respects.  Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997); Hendrix v. Snow, 170 Fed.Appx. 68, 78 (11th Cir. 2006) (affirming summary judgment on claim of racial discrimination based on failure to proffer comparator).

worked at the City for many years. Thus, for purposes of this summary judgment proceeding, the first, second,[14] and fourth prongs have been met, and this Court need only address the third prong.

Plaintiff claims that she was discriminated against by all white employees during her entire employment. (Dkt. 74, pp. 27-28).[15] She specifically claims that she was denied access to the sick leave bank in May 2007. (Dkt. 49, para. 79).[16] Plaintiff, however, admits that her May 2007 application was incomplete, failing to provide the required medical documentation for approved sick leave and failing to apply in a timely fashion. (Dkt. 74, pp. 57-59). She knew at some point that she had 200 more usable work hours in the sick leave bank; however, she did not apply for withdrawal of sick bank leave within seven days of the date she desired to begin using leave, nor did she submit a second physician's diagnosis and expectation of the date she could return to work. Plaintiff did not even visit a second physician for the "medical substantiation" until the day she was terminated. Dr. Thierry even wrote the note on the same day he evaluated her, but May 24, 2007, was too late under the clear language of the City's personnel policy and the circumstances of this case. Thus, the record clearly shows how Plaintiff did not comply with the City's protocol for applying for hours from the sick leave bank.

---

[14] The adverse employment action, however, is limited to Plaintiff's termination.

[15] To the extent Plaintiff testified at her deposition that she was also discriminated on the basis of age and gender, see docket 74 at page 16, the Court finds that she has wholly failed to set forth a prima facie a prima facie case for either.

[16] All previous requests for sick leave had been granted to her.

Nevertheless, this Court must address whether any other employees who were not African-Americans were treated more favorably with respect to usage of the sick bank leave. As comparators, Plaintiff identifies two white people, a female, Catherine Coyle, and a male, Mark Brenchley. Both employees were allowed to work from home. Ms. Coyle was employed in a similar position as Plaintiff; however, Mr. Brenchley is not similarly situated because he was her supervisor. Consequently, Mr. Brenchley cannot be viewed as a comparator.

With respect to Ms. Coyle, Plaintiff cannot show the existence of preferential treatment. Plaintiff never asked for the accommodation to work from home. Not only did she fail to request such accommodation, she did not provide any medical documentation supporting her ability to work from home. The medical documentation all provided that Plaintiff could not work. Even the letter from Dr. Thierry, her second opinion, extends her return-to-work date to August 2, 2007.

In any event, Ms. Coyle has not been shown to be an appropriate comparator because there is no evidence of whether Ms. Coyle was charged with sick leave and whether Ms. Coyle had any sick leave time available to her without dipping from the sick bank leave. Plaintiff's complaint seems to be founded on statements from her white co-worker, Eric Cotton, who did not think it was fair that Ms. Coyle and Mr. Brenchley could work from home.

Two other possible claims of racial discrimination and disparate treatment were not specifically addressed in her deposition, but were alleged in the Third Amended

Complaint. First, Linda Cadle, a white female, was suspended after she used a racial slur. Plaintiff's attempts to characterize Ms. Cadle as an appropriate comparator fail, however. Both the nature of the offenses committed and the nature of the punishments imposed are far from "nearly identical." See Burke-Fowler v. Orange County, Fla., 447 F.3d 1319, 1323 (11th Cir. 2006) (citing Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999) and requiring that plaintiff show misconduct "nearly identical" in quality and quantity).[17] Plaintiff's offenses were essentially excessive absenteeism (AWL) and abuse of her position as a city employee to engage in business with the City. Ms. Cadle, in contrast, used the word "nigger" at work. Plaintiff was terminated after failing to appear for her pre-disciplinary hearing at which she could have defended herself against the charges made, and Ms. Cadle was suspended from work. The offenses and punishments for each woman were entirely dissimilar and as such, Ms. Cadle does not meet the requirements of a comparator.

Finally, the statute of limitations of four years from the date this lawsuit was filed[18] bars any claims rising from the 1999 evaluation in the police department and her six-month probationary evaluation she received after beginning work in the Land

---

[17]  See also Rioux v. City of Atlanta, Ga., 520 F.3d 1269, 1276-77 (11th Cir. 2008) (holding comparators may be examined at pretext stage and "nearly identical" standard applies).

[18]  This lawsuit was filed in state court on April 28, 2008, and was removed to this Court on May 13, 2008. See docket 1.

Development Department in July 2001.  Thus, to the extent that she seeks redress for any

racial discrimination or disparate treatment outside the four years, Plaintiff is barred from

any such recovery.[19]  Accordingly, Plaintiff's claim of disparate treatment and racial

discrimination are not supported by the record.

## Wrongful Termination (Count V)

Plaintiff testified in her deposition that her termination was motivated by race, age

and gender.  (Dkt. 74, pp. 15-16).  She even testified that there were more factors that

played a role in her wrongful termination, but she refused to tell the City's counsel what

those factors include.  (Dkt. 74, p. 16-17).  Because the record does not contain any direct

evidence that her termination was motivated by race, Plaintiff must prove that she was

"(1) a member of the protected class; (2) qualified for the position; (3) subjected to

adverse employment action; and (4) replaced by a person outside the protected class or

---

[19]   That Plaintiff may have claimed being forced by the City to send her private
medical information over an unsecured facsimile machine amounts to disparate treatment
or racial discrimination, is of no moment.  She never addressed this claim in her
deposition when asked if there was anything else she could think of that constituted racial
discrimination or disparate treatment.  In her deposition, Plaintiff, unfortunately, refused
to answer many of the non-privileged questions that the City's counsel asked.  (Dkt. 74,
pp. 17 & 35).  She seemed concerned with the possibility that the City's attorney would
"take it and just turn it into something that it's not."  (Dkt. 74, p. 35).  She later refused to
give the City's attorney names of comparators, stating, "you are just going to flip it
around."  (Dkt. 74, p. 60).  For many of the questions posited, she simply stated that all of
the City's reasons for terminating her, including the notice of the pre-disciplinary hearing,
were "bogus."  (Dkt. 74, p. 69).  Nevertheless, having reviewed the Third Amended
Complaint, her deposition, and all other evidence in the record, the Court finds no
genuine issue of material fact with respect to the claims of disparate treatment and racial
discrimination.

suffered from disparate treatment because of membership in a protected class."

Thompson v. Miami-Dade County, 2009 WL 1097487, *4 (S.D. Fla. Apr. 22, 2009)

(quoting Bolton v. Potter, 198 Fed.Appx. 914, 916 (11th Cir. 2006), which cites

McDonnell Douglas).

 Analyzing the prima facie case, the Court finds that Plaintiff is an African-American who was subjected to the adverse employment action of termination. The Court will assume that she was qualified for the position, although the record shows that she was unable to return to work after March 23, 2007, and according to Plaintiff's testimony, she remains unable to return to work. (Dkt. 74, p. 13). She testified that she never requested that she be given the accommodation of working from home, and the medical documentation shows that she was never cleared to work either at home or at the office. (Dkt. 74, pp. 65-67, 71). With respect to the fourth and final prong, however, she cannot show that she suffered from disparate treatment because she was African-American or female or over forty. Her evidence of racial animus is no different for this claim than the other. She testified that she "feels" and "sees" that she is being discriminated against because of her race— that she is "a black person" who "would recognize it right off the bat from something you wouldn't even understand as being

Caucasian."[20]  (Dkt. 74, pp. 23-24).  Beyond her feelings, she never testified to any other evidence of racial motivation for her termination.[21]

Assuming that the Plaintiff proved her prima facie case, then the City carries merely the burden of production, as opposed to persuasion, to offer a legitimate non-discriminatory reason for the termination.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000) (articulating the different standards for the employer).  The burden then shifts to Plaintiff to rebut the proffered reason in order to show pretext.  Chapman v. AI Transport, 229 F.3d 1012, 1030 n. 19 (11th Cir. 2000) (en banc).  The City's legitimate non-discriminatory reasons for terminating Plaintiff were incompetence and AWL.  These reasons were documented in the notice of pre-disciplinary hearing.  (Dkt. 74, Ex. 12).  When Plaintiff failed to appear at the hearing to defend against the charges, she was terminated in accordance with the notice.  The reasons of incompetence and AWL may each be "a good reason, a bad reason, a reason based on erroneous facts or no reason at all[,]" but on their face, they are not discriminatory reasons.

Having proffered a legitimate, non-discriminatory reason, Plaintiff must now rebut the reason and show pretext.   Pretext is "a lie, specifically a phony reason for some action."  Silvera v. Orange County School Bd., 244 F.3d 1253, 1261 (11th Cir. 2001)

_____

[20]   The City's attorney who took the deposition is a Caucasian.

[21]   Even her white co-worker, Eric Cotton, felt that it was unfair that Mr. Brenchley and Ms. Coyle were permitted to work from home.

-18-

(quoting <u>Wolf v. Buss (America) Inc.</u>, 77 F.3d 914, 919 (7th Cir. 1996)).   The Plaintiff

can either "persuad[e] the court that a discriminatory reason more likely motivated the

employer or . . . show[] that the employer's proffered explanation is unworthy of

credence."  <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 256, 101 S.Ct. 1089,

1095, 67 L.Ed.2d 207 (1981).  It must be shown that the reason proffered by the City was

false and that discrimination was the real reason for the termination.  <u>See</u> <u>Wofsy v.

Palmshores Retirement Cmty.</u>, 285 Fed.Appx. 631, 635 (11th Cir. 2008) (citing <u>St. Mary's

Honor Center v. Hicks</u>, 509 U.S. 502, 515, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407

(1993)).

      Plaintiff's only evidence that the reasons for termination are pretext is that the

reasons are "bogus"—nothing more.  She never denied the reasons.  She admitted that she

was initially taking the time off to prepare for her business's convention, to which she had

invited the City and its employees to pay money to attend.  (Dkt. 74, 49-50, Ex. 5).  She

claimed she did not remember her improper computer use, but that she "was not one for

playing on the computer."  (Dkt. 74, pp. 69-70).  She testified that she followed the call-in

procedure for AWL on March 28, 2007, because she was "out on medical substantiated

leave."  (Dkt. 74, p. 70).  Presumably, in her mind, she thought she had the doctor's notes

and that was sufficient.  Clearly, however, she never even had the second physician's

evaluation or note for AWL until the very day she was terminated, because her first visit

with Dr. Thierry for a second opinion was on that day.  (Dkt. 74, p. 77, Ex. 13).  She also

testified that she did not attend the pre-disciplinary hearing because she was out on

medical leave. (Dkt. 74, p. 60). Even though she cannot substantiate her failure to follow the appropriate channels for AWL, she attempts to use the fact that she cannot return to work as a reason for missing, and not even recognizing, the disciplinary hearing. (Dkt. 74, p. 76). The record is devoid of any evidence that she contacted anyone at the City regarding the hearing and her reasons why she was planning on not attending. Plaintiff's failure to show that the reasons for termination were false leaves her unable to show pretext on the part of the City. Consequently, summary judgment must be granted in favor of the City.

### Loss of Consortium (Count VII)

Having reached the decisions above, Plaintiff Mr. Crawford's derivative claim for consortium must fail. No evidence has been presented to support his claim, other than allegations in the Third Amended Complaint and his answers to interrogatories (stating the amount sought as $500,000).[22] There are no other claims presented in this case from which damages have been shown. Accordingly, summary judgment is granted in favor of the Defendants on the Third Amended Complaint.

It is therefore **ORDERED AND ADJUDGED** as follows:

(1)     Defendant's Motion for Summary Judgment (Dkt. 72) is **GRANTED**.

---

[22]   To the extent any other damages are claimed by Plaintiff Mrs. Crawford such as back pay, benefits, and front pay, Plaintiffs have failed to present any evidence of such damages resulting from their complaints. She testified at deposition that her mental state had worsened, but refused to answer with any specificity. (Dkt. 74, pp. 73-76 & 79-80).

(2)     The clerk is directed to enter final summary judgment in favor of

        Defendants and against Plaintiffs.

(3)     The clerk is directed to close the case.

**DONE AND ORDERED** at Tampa, Florida, on October 28, 2009.


___s/*Richard A. Lazzara*_____
**RICHARD A. LAZZARA**
**UNITED STATES DISTRICT JUDGE**


<u>**COPIES FURNISHED TO**</u>:
Counsel of Record
Plaintiffs, *pro se*